Exhibit 4

# BuzzFeed

Zoe Tillman c/o BuzzFeed News
1630 Connecticut Ave. NW, 7th Floor
Washington, DC 20009

June 28, 2017

Director, Office of Information Policy
US Department of Justice
1425 New York Avenue NW, Suite 11050
Washington, DC 20530-0001

**RE: APPEAL - FOIA Request 17-OIG-208**

To Whom It May Concern,

I write to appeal the Office of the Inspector General's ("Agency") denial, *see* Ex. A (the "Denial"), issued in response to my May 16, 2017, Freedom of Information Act ("FOIA") request seeking records relating to the Investigative Summary published on the Agency's website on May 16, 2017, entitled, "Finding of Misconduct by a Former United States Attorney for Having an Inappropriate Relationship With a Subordinate," *see* Ex. B (the "Request").

Here, the Agency attempts to keep from the public the names of high-ranking government officials (one, a political appointee) despite findings of wrongdoing on the part of each.  This withholding is utterly improper and contrary to decades of case law.  It must be reversed.

## BACKGROUND

On May 16, 2017, the Office of the Inspector General for the Department of Justice published an investigative summary on its website describing findings of misconduct by a former United States attorney.  *See Finding of Misconduct by a Former United States Attorney for Having an Inappropriate Relationship With a Subordinate*, Investigative Summary, Office of the Inspector General (May 16, 2017), https://goo.gl/U1Mp1Z ("Release").  The Release did not identify the former US attorney.

The requested records relate to the full report prepared by the Agency about that investigation, which was submitted to the Executive Office for United States Attorneys and the Office of the Deputy Attorney General.  These records are the subject of immense public interest because they relate to actual findings of misconduct by senior-level Justice Department officials.  United States Attorneys are prominent political appointees responsible for oversight of federal law enforcement actions and policy implementation.  The disclosure of details about the initial wrongdoing and the resulting investigation contributes to the public's understanding of how the Agency responds to misconduct allegations and how high-level officials are subject to investigation and held accountable when there is a finding of misconduct.

Indeed, I have previously reported on these kinds of topics.  For example, I have reported on an IG report about how sexual harassment complaints are handled in the Justice Department

1

Civil Division, the IG's Office decision to release summaries of its misconduct investigations, and the nominations of United States Attorneys.

## REQUEST

Based on the overwhelming public interest in this matter, on May 16, 2017, I submitted a FOIA request for:

- A copy of the full report that was provided by the Agency to the relevant Justice Department components related to an Investigative Summary published by the Agency on its website entitled, "Finding of Misconduct by a Former United States Attorney for Having an Inappropriate Relationship With a Subordinate."

## DENIAL

On June 12, 2017, the Agency issued its response to my request. According to the Denial, large portions of the full report were "excised pursuant to the Freedom of Information Act, 5 U.S.C. §552(b)(6) and (7)(C)."

## ARGUMENT

"FOIA 'was enacted to facilitate public access to Government documents' and 'was designed to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *CREW v. DOJ*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (citing *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976))). So "[a]t all times, courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" *ACLU v. DOJ*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Ray*, 502 U.S. at 173). "Because of FOIA's 'goal of broad disclosure,' the Supreme Court has 'insisted that the exemptions be 'given a narrow compass.'" *CREW*, 746 F.3d at 1088 (quoting *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1265 (2011)); *see also FBI v. Abramson*, 456 U.S. 615, 630 (1982) ("FOIA exemptions are to be narrowly construed."). "FOIA's 'limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *CREW*, 746 F.3d at 1088 (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *Rose*, 425 U.S. at 361)). It is the Agency's burden to "establish[] that a claimed exemption applies." *Id.*

The Denial here is improper because, without legitimate justification, it favors secrecy—not disclosure. Not only is withholding improper for the reasons discussed below, it is improper because the Denial does not apply the mandated presumption of openness as it fails to explain, as it must, whether disclosure would actually harm an interest protected by the Exemptions to FOIA. As such, the Denial should be reversed and the records promptly disclosed consistent with the letter and spirit of FOIA.

## The Agency Has Not Met Its Burden Of Proving That The Documents Are Subject To Withholding Under The Privacy Exemptions

Exemptions 6 and 7(C) are interrelated. Exemption 6 applies to "'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy,'" while Exemption 7(C) applies to "'records or information compiled for law enforcement purposes, but only to the extent the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.'"  *CREW v. DOJ*, 854 F.3d 675, 681 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552(b)(6)-(7)).  Where there is no dispute that the requested records were compiled for law enforcement purposes, only Exemption 7(C) need be addressed because it sets "a lower bar for withholding material" than Exemption 6.  *CREW*, 746 F.3d at 1091 at n.2.

**1.     Even Assuming The Records Are Law Enforcement Records, They Are Not Subject To Withholding**

Because Exemption 7(C) only protects against disclosure that would "constitute an '*unwarranted*' invasion of personal privacy," agencies must necessarily consider whether the privacy interest sought to be protected outweighs the public interest in release of the information sought.  *ACLU*, 655 F.3d at 6.  The privacy interest at issue is an individual's interest in "avoiding disclosure of personal" matters and maintaining an "individual's control of information concerning his or her person."  *DOJ v. Reporters Committee*, 489 U.S. 749, 762 (1989).  The public interest to be weighed "is the extent to which disclosure advances 'the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'"  *Id.* (citation omitted).

### 1.1.     The personal privacy interest is *de minimis*

Not all personal privacy interests count for the purposes of the privacy Exemptions.  For example, courts have found that the disclosure of embarrassing information, criminality, and government misconduct all may implicate relatively few privacy interests.  *See, e.g.*, *Stern v. FBI*, 737 F.2d 84, (D.C. Cir. 1984) ("individuals have a strong interest in not being associated *unwarrantedly* with alleged criminal activity" (emphasis added); *Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980) (disclosure of embarrassing information is not alone the sufficient).  The same can be said even for information normally considered "personal," so long as the identify of the person is unknown.  *ACLU v. DOD*, 543 F.3d 59, 84 (2d Cir. 2008).  Indeed, the existence of a privacy interest is context specific, and not every context will implicate one.  *Brown v. Perez*, 835 F.3d 1223, 1236 (10th Cir. 2016) (disclosure of names does not itself create a privacy interest to be protected).

Moreover, even where a cognizable privacy interest is identified, other factors may diminish those interests.  For example, when information becomes publicly known, any "interests in privacy fade."  *Reporters Committee*, 489 U.S. at 764 n.15; *see also CREW*, 746 F.3d at 1092; *ACLU*, 655 F.3d at 7 (noting that there was nothing more than a *de minimis* privacy interest in "the disclosure of convictions and public pleas"); *cf. ACLU v. CIA*, 710 F.3d 422, 428-32 (D.C. Cir. 2013).  And when several years have passed since the event detailed in the records, any privacy interest is diminished.  *Outlaw v. Dep't of Army*, 815 F.Supp. 505, 506 (D.D.C. 1993); *see also Davis v. DOJ*, 460 F.3d 92, 92 (D.C. Cir. 2006) (death of individual in records decreases privacy interest therein).  Privacy interests are also diminished by an individual's status.  For example, high-ranking government officials and employees have a reduced privacy interest.  *Perlman v. DOJ*, 312 F.3d 100, 107-09 (2d Cir. 2002) (INS general counsel); *Stern*, 737 F.2d at 93-94 (FBI Special Agent-in-Charge); *Chang v. Dep't of the Navy*, 314 F. Supp. 2d 35, 42-45 (D.D.C. 2004) (commander of ship).

3

Here, many of the redactions relate to the United States Attorney ("USA") and a Supervisory Assistant United States Attorney who were involved in misconduct regarding the use of their positions including preferential treatment and creating a hostile work environment.  As the OIG itself said in investigating these allegations, "The OIG substantiated the allegations" that "a United States Attorney (USA), now retired, engaged in misconduct by engaging in an intimate personal relationship with a high-level, but subordinate, supervisor in the Office (Supervisory AUSA)."  *See, supra*, Release.  Moreover, this wrongdoing occurred several years ago--and, at least as to the unidentified United States Attorney, he has long since retired.  Thus, any privacy interest here is at its ebb.

### 1.2.    The public interest in disclosure is overwhelming

For the purposes of Exemption 7, the public interest at issue is that embodied by FOIA's "core purpose" of "shed[ding] light on an agency's performance of its statutory duties."  *Reporters Comm.*, 489 U.S. at 773-76.  A requester may demonstrate such an interest by first "show[ing] that the public interest sought to be advanced is a significant one," and, second, "show[ing] the information is likely to advance that interest."  *NARA v. Favish*, 541 U.S. 157, 172 (2004). Here, both factors are easily satisfied.

The public interest here is overwhelming for at least three reasons.

First, the public has an interest in knowing how (or if at all) the individuals involved in this investigation were misusing public funds, abusing their power, or giving each other preferential treatment in the operation of the United States Attorney office.  Indeed, the OIG believed the case was important enough to issue a press release on its findings substantiating the troubling allegations.  *See generally* Release.

Second, the public has a real interest that the OIG carried out its investigatory function even handedly--especially in light of the sheer number of witnesses alleging a hostile environment. This is especially so as the OIG just released a report noting, among other things, that there are "significant weaknesses in the Civil Division's tracking, reporting, and investigating of the 11 sexual harassment and misconduct allegations . . . , as well as inconsistencies among penalties imposed for substantiated allegations."  Review of the Handling of Sexual Harassment and Misconduct Allegations by the Department's Civil Division, OIG, May 2017, at i ("Results in Brief").

But third and most importantly, the public has an interest in knowing who the USA in question is to prevent innocent parties from being implicated.  The material released indicates that the USA was still accessing his computer as of December 2015.  Thus, he was still a USA at that point in time.  And the Release notes that the USA retired shortly after the investigation began sometime, presumably, in 2016.  At least seven USA's retired in 2016, but the public has no idea which USA is the subject of these substantiated allegations of wrongdoing.  Thus, release of the name would not only indicate who was responsible for the wrongdoing but it would also dispense with any suspicion that perfectly innocent parties were involved in wrongdoing.[1]

---

[1] U.S. Attorney Barry Grissom – effective April 15, 2016, https://goo.gl/GRHBCm; US Attorney Bill Nettles – effective June 15, 2016, https://goo.gl/ud9KDd; U.S. Attorney Malcolm Bales – effective

Additionally, disclosure will advance this interest.  Disclosure of documents detailing government malfeasance and incompetence is, of course, likely to advance the significant public interest in knowing what the government is up to--especially when it comes to misconduct.  *Stern*, 737 F.2d at 93-94; *see also, e.g.*, *Perlman*, 312 F.3d at 107-09 (ordering release of documents relating to investigation of former INS general counsel implicated in wrongdoing).  But the advancement of the public interest inquiry is not limited to documents showing wrongdoing.  Indeed, nothing in FOIA is solely focused on uncovering misconduct.  *See, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Serv.*, 579 F. Supp. 2d 151, 154 (D.D.C. 2008) (disclosure of visitor "names would shed light on why the visitor came to the White House"); *see also Cooper Cameron Corp. v. Dep't of Labor*, 280 F.3d 539, 549 (5th Cir. 2002).

Here, it goes without saying that there is a significant public interest in the operation of the United States Attorneys' Offices as well as the efficacy of the investigation into the individual discipline of high-ranking employees.  This interest is even greater here because the public has no way of knowing where in the vast system of U.S. Attorneys Offices the wrongdoing occurred originally.  Indeed, not only is the USA's name withheld, the district in which the conduct occurred has also been withheld, as has scads of other information—essentially implicating the careers of multiple USAs who may not be involved in any wrongdoing whatsoever.  Moreover, by failing to disclose the identity of any individual involved (whether the USA or the Supervisory AUSA), it is impossible to judge the efficacy of the investigation and the ultimate findings of the same.  For all these reasons, the public interest is significant and disclosure will greatly advance that interest.

### 1.3. The public interest significantly outweighs the privacy interest

The public interest here vastly outweighs any privacy interest.  *See, e.g.*, *Roth v. DOJ*, 642 F.3d 1161, 1181 (D.C. Cir. 2011) (public interest in knowing whether the federal government withheld information corroborating an inmate's innocence outweighed privacy interests of men potentially linked them to the murders); *see also ACLU*, 655 F.3d at 16 (public interest in disclosure of prosecutions where defendants were subject to warrantless cell phone tracking outweighed de minimis privacy interest in records); *EFF v. DNI*, 639 F.3d 876, 887 (9th Cir. 2010) (public interest in disclosure of corporate lobbyists petitioning the government clearly outweighed privacy interests).

When government wrongdoing is shown, courts weigh a variety of factors, although no single one is determinative to decide if an individual should be identified.  *Perlman*, 312 F.3d at 107.  A court asks, for example, the rank of the employee, the degree of misconduct and strength of the evidence, and whether the information is related to the employee's job function or is wholly

---

September 30, 2016 https://goo.gl/qnEdEQ; U.S. Attorney Peter J. Smith – effective October 1, 2016, https://goo.gl/8WWvzw; U.S. Attorney William Hochul – effective October 28, 2016, https://goo.gl/Nv6uiU; U.S. Attorney Zane David Memeger – effective December 23, 2016, https://goo.gl/ByvFXP; U.S. Attorney Jim Lewis – effective December 24, 2016, https://goo.gl/37PBw4. To be clear, we are not suggesting that any one of these individuals is the USA found to have committed the misconduct.  The point here is simply that the OIG's response leaves the public guessing as to whether one of these individuals (or someone else) was, in fact, the subject of the investigation.  FOIA, for good reason, does not require the public to simply guess when public servants have been found to have committed misconduct on the public's dime.

personal.  *Id.*  Here, all of the factors weigh in favor of disclosure.

**The Rank of the Employee.**  The higher ranking the employee the more strongly this factor weighs in favor of disclosure.  *Id.* at 107-09 (INS general counsel); *Stern*, 737 F.2d at 93-94 (FBI Special Agent-in-Charge); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1138 (9th Cir. 2008) (chief park ranger); *Chang*, 314 F. Supp. 2d at 42-45 (commander of ship).  As one court explained, there is a difference between "political appointee[s] or senior manager[s]" and mere "staff-level career civil servant[s]."  *Bartko v. DOJ*, 128 F. Supp. 3d 62, 71 (D.D.C. 2015); *see also Wood v. FBI*, 432 F.3d at 88 (noting difference between "low rank" employees and "decision-makers").

Here, any individuals who rank above staff-level civil servants have a markedly decreased privacy interest in protecting their identities.  Indeed, the USA, a political appointee, is clearly a high-ranking official.  *Perlman*, 312 F.3d at 107-09.  Moreover, the OIG admitted in its press release that the Supervisory Assistant United States Attorney was a "high-level . . . supervisor." *See* Release.  To the extent any other individuals involved have similar stature, this too weighs in favor of disclosure.

**Degree of the Wrongdoing.**  "This factor requires a court to examine the degree of wrongdoing allegedly committed by the employee and the strength of the evidence."  *Perlman*, 312 F.3d at 107.  "Strong evidence of wrongdoing" weighs in favor of disclosure.  *Id.*; *see also Favish*, 541 U.S. at 174 (absent findings of wrongdoing, a requester "must 'produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred'").  Although not a *per se* requirement, such a showing may be made by demonstrating that the employee or official "'deliberately and knowingly'" participated in wrongdoing.  *Stern*, 737 F.2d at 94.  Moreover, where the misconduct touches on the execution of an agency's legislatively assigned duties, such misconduct is considered serious.  *See, e.g.*; *id.*; *Perlman*, 312 F.3d at 107.

Here, there is clear wrongdoing and that wrongdoing is serious, both of which weigh in favor of disclosure.  As the OIG explained in the Release, "The OIG found that the USA's misconduct gave the appearance of partiality, created a difficult work environment, and violated Executive branch-wide standards of conduct, federal ethics regulations, and possibly federal regulations and DOJ policy regarding sexual harassment in the workplace."  *See* Release.  There can be little doubt that these *substantiated* violations weigh in favor of disclosure.

**The Wrongdoing Is Not Personal.**  Wrongdoing that relates to an employee or official's conduct in executing his or her official duties weighs in favor of disclosure, while purely personal misconduct does not.  *Perlman*, 312 F.3d at 108 ("The more the information sought sheds light on what the government is doing, the more this factor favors disclosure.").  For example, where an employee's conduct permits others to "obtain preferential treatment, undue access and exercise improper influence" in a government function, this factor will weigh strongly in favor of disclosure.  *Id.*

Here, there can also be little question that the wrongdoing related to the individuals' government functions rather than purely private conduct.  Again, while the affair here may seem at first glance to be personal in nature, it is anything but.  *See, e.g.*, *Eberg v. DOD*, 193 F. Supp. 3d 95, 118 (D. Conn. 2016).  The Release makes this clear in finding that the affair spilled over into the day-to-day functioning of the office, violating various ethical regulations against

6

preferential treatment and creating an impossible work environment.  This misconduct can hardly be defined as purely personal, and thus this factor too weighs in favor of disclosure.

**The Balance Requires Disclosure.**  "The public has a[n] . . . interest . . . in knowing the identities of disciplined government officials 'in order to hold the governors accountable to the governed.'"  *Chang*, 314 F. Supp. 2d at 43.  Here, the Denial failed to consider this interest, and for that reason it must be reversed.

At issue here are high-ranking government officials who have been the subject of disciplinary proceedings that found against them.  *Id.* at 43.  Again, the Release made clear that the allegations against these individuals were substantiated.  Moreover, under similar circumstances, courts have found that agencies must release information of this ilk:  "Sexual harassment by a superior in the workplace is not information of a personal nature, and is most certainly related to that superior's job function."  *Eberg*, 193 F. Supp. 3d at 118.  On the other hand, there is a relatively trivial privacy interest in keeping their malfeasance or general incompetence safe from the public eye.  For these reasons, the Denial should be reversed and the records should promptly be disclosed in full.

### 2.   The Agency Has Not Considered Whether Disclosure Would Harm An Interest Protected by the Exemption

Even if the withholding here is technically permissible (and to be clear it is not), the Agency has nevertheless failed to consider whether release of the documents or removal of the redactions would harm an interest protected by FOIA.  In 2016, Congress amended FOIA to codify a presumption of openness, by which the Agency failed to abide in processing the Request.  Even if a responsive record qualifies for withholding under an exemption, this presumption directs that an agency "*shall* withhold information under [FOIA] only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8) (emphasis added).  Where an agency cannot make such a showing, the withheld information must be disclosed.  *See, e.g.*, *Bergeron v. DOJ*, No. 13-cv-00625 at 6 (slip op) (D. Nev. Jun. 25, 2015) (ordering disclosure of redacted material in email because the DOJ failed to "establish that disclosure of the document would foreseeably harm the agency's decision-making process by revealing the mental processes of decision-makers" (construing the 2016 amendment's executive order predecessor)).  Here, there is no evidence at all that the Agency even considered whether "the disclosure would harm an interest protected" by the Exemption, requiring reversal of the Denial on these grounds alone.  5 U.S.C. § 552(a)(8).

*      *      *

For the foregoing reasons, the Agency's decision should be reversed and the Request should be granted in full.  To the extent that it is affirmed, in whole or in part, please provide a detailed explanation for that decision.  Because this information is on a matter of great public interest, we request expedited treatment of this.  In any event, we trust that we will receive your decision within 20 business days as required by 5 U.S.C § 552(a)(6)(A)(ii).

Thank you for your prompt attention to this matter.  Please feel free to reach out to me at any time.

Sincerely,

Zoe Tillman

# EXHIBIT A

U.S. Department of Justice

Office of the Inspector General

June 12, 2017

Zoe Tillman
zoe.tillman@buzzfeed.com

Subject:    Freedom of Information/Privacy Act Request [17-OIG-208]

Dear Mr. Tillman:

This responds to your Freedom of Information Act request to the Office of the Inspector General (OIG).  Specifically, your request seeks records of the OIG report entitled "Investigative Summary:  Finding of Misconduct by a Former United States Attorney for Having an Inappropriate Relationship With a Subordinate."  The report responsive to your request has been reviewed.  It has been determined that certain portions of such report be excised pursuant to the Freedom of Information Act, 5 U.S.C. §552(b)(6) and (7)(C).  Consequently, please find enclosed that information which can be released pursuant to your request.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. 552(c) (2006 & Supp. IV 2010).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Deborah Waller at (202) 616-0646 for any further assistance of your request.  Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601

Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at
ogis@nara.gov; telephone at (202) 741-5770; toll free at 1-877-684-6448.

Sincerely,

Jeanetta M. Howard
Government Information Specialist
Office of the General Counsel

Enclosure

2

**U.S. Department of Justice**
Office of the Inspector General

# REPORT OF INVESTIGATION

| SUBJECTS | | CASE NUMBER |
|---|---|---|
| ██████████████  ████████████████ <br> United States Attorney (former) <br> ██████████████████ | | ███████████ |

| OFFICE CONDUCTING INVESTIGATION | DOJ COMPONENT |
|---|---|
| Chicago Field Office | Executive Office for U.S. Attorneys |

| DISTRIBUTION | | | STATUS | | | | | |
|---|---|---|---|---|---|---|---|---|
| [X] | Field Office | CFO | [] | OPEN | [] | OPEN PENDING PROSECUTION | [X] | CLOSED |
| [X] | AIGINV | | PREVIOUS REPORT SUBMITTED: | | | [] YES | [X] | NO |
| [X] | Component | EOUSA | Date of Previous Report: | | | | | |
| [] | USA | | | | | | | |
| [X] | Other | ODAG | | | | | | |

## SYNOPSIS

The Office of the Inspector General (OIG) initiated this investigation upon the receipt of information from the Executive Office for U.S. Attorneys (EOUSA) that ██████████████████████████████████ contacted EOUSA and reported that, for an unknown time period, United States Attorney (USA) ████████ ██████████ (former) and ██████████████████████████ had an extra-marital affair ████████████ which created an "unbearable atmosphere" in the U.S. Attorney's Office (USAO) ████████████████████████████████

Subsequent to the onset of the investigation, ████████ provided to the OIG additional information indicating that ████████ and ████████ alleged affair caused disparate treatment regarding bonuses and disciplinary actions, ██████████████████

████████████████████████████████████████████

The OIG investigation substantiated the allegations that ████████ engaged in an unacknowledged extra-marital affair with ████████ which gave the appearance of partiality and created a difficult work environment for some USAO ████████ employees in violation of 5 CFR 2635.101 and 2635.502, and possibly in violation of regulations and policy against sexual harassment, including 29 CFR § 1604.11 and U.S. Attorney's Manual 3-5.104. ████████████████████████████████████████████████

████████████████████████████████████████████

████████ retired from federal service ████████████ shortly after the initiation of the OIG's investigation.

The OIG has completed its investigation and is providing this report to the EOUSA and the Office of the

| DATE | May 1, 2017 | SIGNATURE | ██████████████████████████ |
|---|---|---|---|
| PREPARED BY SPECIAL AGENT | | ██████████████ | |
| DATE | May 1, 2017 | SIGNATURE | *John F. Oleskowicz* (signed) — Digitally signed by JOHN OLESKOWICZ, DN: c=US, o=U.S. Government, ou=Dept of Justice, cn=JOHN OLESKOWICZ |
| APPROVED BY SPECIAL AGENT IN CHARGE | | John F. Oleskowicz | |

OIG Form III-207/4B *(06/22/05)*  *Portions of the Report of Investigation may not be exempt under the Freedom of Information Act (5 USC 552) and the Privacy Act (5 USC 552a).*

Deputy Attorney General for information.

# ADDITIONAL SUBJECTS



# DETAILS OF INVESTIGATION

## Predication

The Office of the Inspector General (OIG) initiated this investigation upon the receipt of information from the Executive Office for U.S. Attorneys (EOUSA) that ███████████████████ contacted EOUSA and reported that, for an unknown time period, United States Attorney (USA) ██████ (former) and █████████████████ had an extra-marital affair ██████████, which created an "unbearable atmosphere" in the U.S. Attorney's Office (USAO) ████████████████████████████

Subsequent to the onset of the investigation, ████████ provided to the OIG additional information indicating that ████████ and ████████ alleged affair caused disparate treatment ████████ regarding bonuses and disciplinary actions, ████████████████████████████

## Investigative Process

The OIG's investigative efforts consisted of the following:

Interview of the following USAO████ employees:

- ████████████
- ████████████
- ██████████
- ██████████
- ██████████
- ████████████████████████
- ██████████████████
- ████████
- ██████████████
- ████████████
- ██████████
- ████████ AUSA
- ████████ former USA.

Review of the following:
- Appraisals and bonus records for ████████████████
- Travel records for ██████ and ██████
- Computer logs for ██████ and ██████
- Training history for ██████ and ██████
- USAO████ performance statistics

- Official e-mails of ▮▮▮ and ▮▮▮▮
- Phone records of ▮▮▮ and ▮▮▮▮ USAO-issued cellular phones

## ▮▮▮▮  Intimate Personal Relationship with a Subordinate

The information provided to the OIG alleged that, for an unknown time period, ▮▮▮ and ▮▮
engaged in an extra marital affair ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which
created an "unbearable atmosphere" in the USAO ▮▮▮▮ Subsequent to the onset of the investigation, the OIG
received further information alleging that ▮▮▮ and ▮▮▮ alleged affair caused disparate of treatment
▮▮▮▮ regarding bonuses and disciplinary actions.

As the U.S. Attorney, ▮▮▮ was ▮▮▮ supervisor. Accordingly, their respective professional
positions undermine the consensual nature of an unacknowledged personal relationship between a supervisor,
here the head of the office, and a subordinate.  In addition, any such relationship potentially violates the public
trust principles outlined in the *Standards of Ethical Conduct* that require supervisors to maintain impartiality in
personnel matters involving their subordinates and to take appropriate steps, such as recusal from all matters
involving the subordinates, to avoid an appearance of loss of impartiality in the performance of their duties.

*The Standards of Ethical Conduct for Employees of the Executive Branch*, articulated in 5 CFR § 2635.101,
"Basic Obligation of Public Service," states in pertinent part the following:

> (a) Public service is a public trust. Each employee has a responsibility to the United States
> Government and its citizens to place loyalty to the Constitution, laws and ethical principles
> above private gain. To ensure that every citizen can have complete confidence in the integrity of
> the Federal Government, each employee shall respect and adhere to the principles of ethical
> conduct set forth in this section, as well as the implementing standards contained in this part and
> in supplemental agency regulations.
>
> (b) General principles. The following general principles apply to every employee and may form
> the basis for the standards contained in this part. Where a situation is not covered by the
> standards set forth in this part, employees shall apply the principles set forth in this section in
> determining whether their conduct is proper.
>
> > (1) Public service is a public trust, requiring employees to place loyalty to the
> > Constitution, the laws and ethical principles above private gain.
> > …
> > (8) Employees shall act impartially and not give preferential treatment to any private
> > organization or individual.
> > …
> > (14) Employees shall endeavor to avoid any actions creating the appearance that they are
> > violating the law or the ethical standards set forth in this part. Whether particular
> > circumstances create an appearance that the law or these standards have been violated
> > shall be determined from the perspective of a reasonable person with knowledge of the
> > relevant facts.

5 CFR § 2635.502, "Personal and Business Relationships," states in pertinent part the following:

(a) Consideration of appearances by the employee. Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of the appearance problem and received authorization from the agency designee in accordance with paragraph (d) of this section.

> (1) In considering whether a relationship would cause a reasonable person to question his impartiality, an employee may seek the assistance of his supervisor, an agency ethics official or the agency designee.
> (2) An employee who is concerned that circumstances other than those specifically described in this section would raise a question regarding his impartiality should use the process described in this section to determine whether he should or should not participate in a particular matter.

29 CFR § 1604.11, "Sexual Harassment," states in pertinent part the following:

> (a) Harassment on the basis of sex is a violation of section 703 of title VII. 1 Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
> 
> ...
> 
> (b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.
> 
> ...
> 
> (d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

The U.S. Attorney's Manual 3-5.103, "Policy Statement on Sexual Harassment," states in pertinent part the following:

> It is the policy of the USAOs and the EOUSA to prohibit sexual harassment in their offices. Sexual harassment is unacceptable conduct in the workplace and will not be condoned. Personnel management within the USAOs and EOUSA shall be free from prohibited personnel practices, as outlined in the provisions of the Civil Service Reform Act of 1978. All employees shall avoid conduct which undermines these principles.

| U.S. Department of Justice | Page: | 6 of 14 |
| Office of the Inspector General | Case Number: | |
| | Date: | May 1, 2017 |

Sexual harassment is a complex and sensitive issue. It is a form of employee misconduct which undermines the integrity of the employment relationship. Harassment on the basis of sex is a violation of Section 703 of Title VII of the Civil Rights Act of 1964, as amended. In accordance with the Equal Employment Opportunity Commission Guidelines on Discrimination Because of Sex, (29 C.F.R. ?.11) [sic], unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

All employees must be allowed to work in an environment free from unsolicited and unwelcome sexual overtures. Sexual harassment debilitates morale and interferes in the work productivity of its victims and other employees. Therefore, behavior of this nature will not be tolerated.

Multiple USAO███ employees described to the OIG their impression that ███████ and ██████ were engaged in an extra-marital affair. For example, staff told the OIG that ██████ and ██████ frequently carpooled to meetings together alone, had lunch alone together almost every day, and flirted with each other frequently during the day in the office, which was embarrassing and distracting for other employees.  Staff relayed that their affair was obvious and not discrete. ████████████████████████████ During office meetings, ████████ always sat by ████ ████████. ████ and ████████ also appeared to frequently go on official travel together so they could spend more time together.

Because of ███████ and ████████ conduct, some employees described the office as a difficult work environment. Several employees even labeled the ███████████ USAO to be a "hostile work environment," due to ██████ and ████████ perceived affair, ████████ harsh management style, ██████ being completely supported by upper management, and having no viable reporting option against ██████  For example, many employees felt they could not report the suspected affair or issues with ████████ to ████ because they believed that ██████ would not challenge his boss or disrupt the office.  Compounding the described poor atmosphere, several USAO███ staff told the OIG that rumors were being discussed by special agents and members of the federal court regarding a possible romantic relationship between ████████ and ████████ which was embarrassing for USAO███ employees.  Some employees also expressed feeling awkward around ████████ ████ ████████ in the same room. ████████████████

Many employees felt extremely stressed, powerless, and avoided ████████ and ████████ at any cost.

Several employees also expressed concerns regarding ████████ and ████████ ability to remain impartial regarding office management.  For example, staff mentioned to the OIG that ████████ always supported ██████ which granted her tremendous influence over the office.  Many employees were afraid to approach ████ regarding ████████ harsh management style because it was assumed they were together, and ████ would always support her.  Several staff members even feared retaliation for their cooperation with the OIG investigation.

Two witnesses--████████████████████, and ██████ told the OIG that they voiced concerns to ████ about his relationship with ████████ ████ told the OIG that in approximately May 2012, she learned of rumors being discussed in the USAO-████ regarding an alleged affair between ████████ and

████████  ████████ had been friends with ████████ and his family for many years. ████████ approached ████████ in an attempt to warn him of these rumors and the perception of his relationship with ████████ According to ████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████ said that ever since that conversation, their relationship has been "strained" and had some "tension."

████████ told the OIG that ████████ and ████████ were "very close" and spent a lot of time together, but that he did not suspect an inappropriate relationship. ████████ stated that after ████████ complained to him about the amount of time ████████ and ████████ spent together, ████████ began to be concerned that ████████ and ████████ conduct could raise questions and possibly generate allegations of an inappropriate relationship. ████████ said that he approached ████████ and told him to spend more time with other people in the office in order to avoid such allegations. ████████ said that ████████ acknowledged ████████ warning, but did not change his behavior in the long run.

A review of ████████ and ████████ official e-mail and cell phone records suggested nearly constant communication between them; however, the OIG did not discover any inappropriate or intimate communications.

The OIG reviewed ████████ training history and determined that he had completed training involving sexual harassment, professional conduct, and ethics.

The OIG conducted a review of ████████ appraisals and bonus records. From 2008 through 2014, ████████ received overall outstanding marks on her appraisals. From 2008 through 2015, ████████ received approximately $15,069.88 in cash awards and $17,073 in salary increases. Despite their personal relationship, ████████ was the reviewing official on ████████ appraisals from 2011 through 2014. ████████ ████████████████████████████████████████████████████████████████████████████████████████████████████

During his first and second interview with the OIG, ████████ admitted to having an inappropriate relationship with ████████ During the second interview, ████████ said that he had "physical intimacy" with ████████ from approximately November 2011 through November 2015. ████████ agreed that it "was a risk" to his job to engage in the affair, and he knew that EOUSA would have asked for his resignation if they discovered the affair. ████████ also told the OIG that he did not believe ████████ had any knowledge of the affair. ████████ acknowledged that in approximately the summer of 2012, ████████ told ████████ that there were rumors of an affair between him and ████████ ████████ told ████████ "don't worry about it." ████████ did not tell ████████ about the conversation with ████████ ████████ also denied treating ████████ differently after this conversation. ████████ did not recall an instance where ████████ told him he should not spend as much time with ████████ ████████ also admitted to spending time in ████████ hotel room when they traveled together. ████████ contested aspects of the allegations by mentioning the following points:

- ████████ did not believe that he betrayed his employees' trust or demonstrated partiality due to the affair with ████████

- ██████ asserted that his affair did not affect the office adversely or create a hostile work environment.
- ██████ noted a high performance record by the office during his tenure.
- ██████ mentioned that his office was full of lawyers, who mostly were not afraid of confrontation and knew how to report misconduct. ██████ said that employees had "multiple opportunities and avenues in which to address" a hostile work environment to include going to ██████ or their immediate supervisor.
- ██████ argued that the timing of the complaint was suspicious and most likely timed to meet agendas of a few "malcontents" in the office.
- ██████ said that ██████ received pay increases because she was one of the "hardest working" individuals in the office, not due to any preferential treatment by him.
- ██████ noted that he applied for his retirement prior to having any knowledge of an OIG investigation.
- ██████ did not believe the affair was a misuse of government time, because the high performance records of the office "speak for themselves."
- A review of computer access logs for both ██████ and ██████ from January 2011 through December 2015 determined that they both logged on to their computers in the USAO-██████ office on the same day for 26 weekend days. ██████ denied spending time alone with ██████ in their offices on weekend days was a misuse of government time. ██████ argued that work was performed on those days, and their actions in the office were not anything "tawdry."

During her first and second interview with the OIG, ██████ stated she had a romantic relationship with ██████ In her second interview with the OIG, ██████ stated, "If you ask, did the relationship become sexual, yes, it did." ██████ characterized her relationship with ██████ as consensual.

The OIG investigation concluded that ██████ engaged in the misconduct as alleged and his actions constituted ethical misconduct in violation of *The Standards of Ethical Conduct for Employees of the Executive Branch* articulated in 5 CFR § 2635.101, "Basic Obligation of Public Service," and 5 CFR 2635.502, "Personal and Business Relationships," and a violation of regulations and policy against sexual harassment, including 29 CFR § 1604.11 and U.S. Attorney's Manual 3-5.104. We also found several of ██████ claims to the OIG to be deeply concerning and to evidence a lack of full acceptance of responsibility for his misconduct; for example, his contention that the timing of the complaint against him was suspicious and due to a few office "malcontents" is remarkable given his acknowledgement that discovery of his hidden affair would have caused the Department to seek his resignation.



███████ admitted to the OIG that when they traveled together, ███████ spent time in ███████ hotel room in connection with their intimate relationship.

███████████████████████████████████████████ Nevertheless, the OIG concluded that by engaging in coinciding travel with ███████ on 16 occasions over a 4+ year period and by carrying on his intimate and inappropriate relationship with ███████ while on official government travel, ███████ exercised poor judgment, and further evidenced the OIG's findings, above, in connection with the unacknowledged personal relationship with a subordinate.



The OIG has completed its investigation and is providing this report to the EOUSA and the Office of the Deputy Attorney General for information.

# EXHIBIT B

Zoe Tillman
BuzzFeed News
1630 Connecticut Avenue NW, 7th Floor
Washington, DC 20009
202-602-1705
zoe.tillman@buzzfeed.com

May 16, 2017

To Whom It May Concern:

Pursuant to the federal Freedom of Information Act, I request access to and/or copies of the full report by the Office of the Inspector General related to the Investigative Summary published on OIG's website on May 16, 2017, entitled: "Finding of Misconduct by a Former United States Attorney for Having an Inappropriate Relationship With a Subordinate."

I request a copy of the full report that was provided by OIG to the relevant Justice Department components.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to the public's understanding of government operations and activities. In particular, the report will shed light on a senior-level Justice Department official who was found to have engaged in an inappropriate relationship with a subordinate. It would also provide information about an assistant US attorney who was found to have made inadvertent errors on his or her financial disclosure form.

Given the finding by the Office of the Inspector General, the public has an interest in learning about the attorneys involved, the behavior at issue, and the resolution of the investigation.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material.

I reserve the right to appeal your decision to withhold any information or to deny a waiver of fees. As I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me by telephone or e-mail, rather than by mail, if you have questions regarding this request.

I look forward to your reply.

Sincerely,
Zoe Tillman